UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LEONA M. QUALEY, | Case No. 3:23-cv-05679-TMC |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| PIERCE COUNTY; EDWARD TROYER; THOMAS DOLAN, | |
| Defendants. | |

## I.    INTRODUCTION

On January 16, 2022, Pierce County Sheriff's Deputy Thomas Dolan shot and killed Moses Portillo during a traffic stop. Deputy Dolan's body and dash cameras recorded the shooting. Dolan was on routine patrol when he observed a vehicle changing lanes without a signal. Dolan pulled the vehicle over and, upon observing Portillo in the backseat with an open container of alcohol, requested his identification. Dolan then noticed ammunition on the floor and realized that Portillo had a firearm in his lap. Dolan immediately drew his own firearm and began shouting commands. Dolan first yelled at Portillo to put his hands up and to show his hands. Portillo raised at least one arm to about shoulder height. Dolan then yelled at Portillo to put his hands on the ceiling. For about ten seconds, Portillo and Dolan had a verbal exchange, and Portillo did not appear to move. Dolan yelled again for Portillo to put his hands on the

ceiling, followed by: "Right now!" Portillo began to turn away from Dolan, and Dolan shot him several times. Portillo died at the scene.

According to Dolan, he believed Portillo was reaching for the weapon on his lap. But a reasonable observer of the camera footage could also conclude that Portillo was attempting to comply with Dolan's command that he put his hands on the ceiling, and that Dolan's heightened emotional state prevented him from rationally perceiving the interaction. These genuine factual disputes are material to whether the shooting violated Portillo's clearly established constitutional rights and must be resolved by a jury. For the reasons explained further below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

## II.    BACKGROUND[1, 2]

On January 16, 2022, the decedent, Moses Portillo, was riding in a car driven by Adara Simonian. Simonian's friend Issac Condor was in the front passenger seat, and Portillo was in the back. Dkt. 41-2 at 7–9, 11. Portillo's leg was in a cast and he was sitting with his back against the car door and his leg stretched out across the back seat. *Id.* at 9.

Around 9:58 p.m., Defendant Thomas Dolan, a deputy in the Pierce County Sheriff's Office, pulled Simonian over. Dkt. 32 at 21:58:41 (body camera video). Dolan told Simonian that he stopped her because her mirror was broken and she was changing lanes without signaling. *Id.* at 21:58:54–55. Using a flashlight, Dolan peered into the vehicle and observed Portillo, Condor, and Simonian. Dkt. 41-1 at 20. After Simonian produced her driver's license, which she

---

[1] The facts as recounted in this section are based on the parties' evidence, including video footage, viewed in the light most favorable to Qualey and drawing all reasonable inferences in her favor.

[2] Several portions of Defendants' summary judgment motion discuss facts not included here, such as Portillo's childhood and his activities before the traffic stop on the night of the shooting. These facts were not known to Dolan at the time of the incident and are irrelevant. *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013).

acknowledged was suspended, Dolan said that he wanted to see Portillo's identification too, "because he's not wearing a seatbelt and he's got an open container." Dkt. 32 at 21:59:23–27. Portillo and Simonian had a mostly inaudible conversation for approximately thirty seconds, while Portillo appeared to be looking for his identification. *Id.* at 21:59:29–21:59:52.

According to Dolan, during their exchange he noticed a box of 9mm ammunition on the floor of the backseat. Dkt. 41-1 at 27. He asked Simonian, "Okay, where's the gun in the car?" Dkt. 32 at 21:59:53. Simonian responded, appearing confused. *Id.* She asked, "The what?" and Dolan responded, "The gun." *Id.* at 21:59:53–55. Dolan, using his flashlight, looked into the backseat and said, "Okay, it's on his lap." *Id.* at 21:59:56–57. Dolan immediately drew his weapon. *Id.* at 21:59:57. Portillo was not holding the gun. Dkt. 41-1 at 29; Dkt. 55-3 at 19. The body camera shows that his right arm was stretched out at shoulder height towards the driver's seat and his left arm was relaxed, his hand out of view. Dkt. 32 at 22:00:00–06.

The situation escalated quickly. Dolan hit the car window closest to Portillo and yelled, "Hey, put your fucking hands up!" Dkt. 32 at 22:00:03–04. Dolan radioed dispatch, explaining "517, one at gunpoint. There's a gun on his lap." *Id.* at 22:00:05–06. Body camera footage shows that Portillo did not move. *See id.* Dolan again yelled, "Hey! Show me your fucking hands!" *Id.* at 22:00:07–10. Portillo raised his left hand above shoulder height. *See id.* at 22:00:09–18. From the dash camera, it is unclear if his right arm was also at shoulder height or out of view. *See generally* Dkt. 32 (dash camera video). Portillo responded to Dolan, though the words are muffled in the footage. *See id.* The parties dispute what Portillo said in response to each of Dolan's directives. *See, e.g.*, Dkt. 40 at 7–9; Dkt. 54 at 2, 6. Simonian continued to express confusion, asking "Wait, what are you talking about?" to which Dolan exclaimed, "There's a fucking gun in his lap!" Dkt. 32 at 22:00:09–17.

Dolan again yelled at Portillo, demanding "Don't fucking reach for it!" *Id.* at 22:00:18–19. Portillo again gave an inaudible response. *Id.* at 22:00:19–20 Dolan shouted again, "Hey! Put your hands on the ceiling!" *Id.* at 22:00:20. Portillo did not comply, responding with a slightly audible "What?" and gesturing with his head but not his hands. *Id.* Dolan shouted again, "Put your hands on the fucking ceiling!" *Id.* at 22:00:24–25 Portillo's response is still muffled, although the words ". . . gonna shoot me?" can be heard. *Id.* at 22:00:27–28. Similar verbal back and forth occurred for a few more seconds. *See id.* at 22:00:28–32.

Finally, Dolan yelled "Right now!" *Id.* at 22:00:33. Again, Dolan yelled, "Right now!" *Id.* at 22:00:34. At that moment, Portillo turned his head and shoulders away from Dolan. *Id*. at 22:00:33; *see also* Dkt. 41-1 at 39–40. In response, Dolan fired, shooting Portillo twelve times. Dkt. 32 at 22:00:34–39. Portillo died at the scene. Dkt. 41-19 at 4; Dkt. 41-20 at 29. Dolan admitted that he never saw the gun in Portillo's hand. Dkt. 41-1 at 29. But he testified that he interpreted Portillo's statements and movements as a threat. *Id.* at 30–32.

Plaintiff Leona Qualey— Portillo's adoptive mother—brought this lawsuit both in her individual capacity and as the representative of Portillo's estate. Dkt. 1 at 3. Qualey filed the suit on July 27, 2023 against Defendants Pierce County, Sheriff Edward Troyer, and Deputy Thomas Dolan. *Id.* at 2–3. The complaint raises claims under 42 U.S.C. § 1983 against all Defendants for violation of Portillo's Fourth Amendment rights, and Washington state law claims for negligence. *Id.* at 6–8. Plaintiff alleges the killing of Portillo was "unnecessary, reckless, negligent[,] and wrongful[.]" *Id.* at 1. She argues that Dolan killed Portillo "in violation of proper police procedure[.]" *Id.* at 1–2.

On November 12, 2024, Defendants moved for summary judgment on all of Plaintiff's claims. Dkt. 40. The motion is fully briefed and ripe for the Court's consideration.

### III.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Consequently, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party . . . ." *Lujan*, 497 U.S. at 888 (internal quotations omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## IV.    DISCUSSION

### A.    Fourth Amendment – Excessive Force

The Defendant, Dolan, argues that he is entitled to qualified immunity for the Estate's Fourth Amendment excessive force claim. Dkt. 40 at 14–20. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts follow a "two-step sequence" to analyze qualified immunity defenses:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). Which step to analyze first is an exercise of discretion "in light of the circumstances in the particular case at hand." *Id.* at 236. The Court begins at the first step.

### B.    Whether Deputy Dolan's Deadly Force was Reasonable

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A police officer's use of deadly force against a person constitutes a seizure within the meaning of the Fourth Amendment," and such "a seizure violates the Fourth Amendment when it is objectively unreasonable." *Calonge v. City of San Jose*, 104 F.4th 39, 45 (9th Cir. 2024) (first citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); then citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

To determine "reasonableness," courts must "careful[ly] balance[e] . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake." *Graham*, 490 U.S. at 397 (internal quotation marks omitted) (citations omitted). "Stated another way, [courts] must 'balance the amount of force applied against the need for that force.'" *Calonge*, 104 F.4th at 45 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010)). "An officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Garner,* 471 U.S. at 3); *see also Calonge*, 104 F.4th at 45 ("'The intrusiveness of a seizure by means of deadly force is unmatched' because of a person's 'fundamental interest in his own life.'") (quoting *Garner*, 471 U.S. at 9).

Courts must determine whether, viewing the facts in the light most favorable to the plaintiff, "the officers' conduct was reasonable using the Supreme Court's *Graham v. Connor* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (quoting 490 U.S. 386, 396 (1989)). The immediate threat prong is the "most important factor." *Calonge*, 104 F.4th at 45 (citations omitted); *see also Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 915 (9th Cir. 2024) (citations omitted). But this test is not exhaustive, and courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela* v. *Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (cleaned up).

Courts evaluate the use of deadly force by a police officer on a "spectrum" of reasonableness. *See Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023); *id.* ("While necessarily a fact-bound question with no per se rules, . . . prior [Ninth Circuit] decisions offer some guidance in evaluating the reasonableness of lethal force in response to a threat."). "At one end of the spectrum, when a suspect points a gun in an officer's direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *Id.* (internal quotation marks omitted) (citations omitted). But officers don't necessarily "have to wait until a gun is pointed at [them] before [they are] entitled to take action." *Id.* (quoting *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

At the other end of the spectrum, "the Constitution does not tolerate the use of lethal force to seize an unarmed, nondangerous suspect by shooting him dead in the absence of probable cause of a threat of serious physical harm." *Id.* at 621 (internal quotations omitted) (citations omitted). And a suspect merely being armed, on its own, does not justify the use of deadly force. *See Calonge*, 104 F.4th at 48 ("We have held over and over that a suspect's possession of a gun does not itself justify deadly force.").

When considering a summary judgment motion, the Court must decide not where on this spectrum the Court believes Dolan's conduct falls, but whether a reasonable jury could find that Dolan's use of deadly force was unreasonable. The Court must view the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in her favor. *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020) (quoting *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018)). When there is video evidence in the record, courts "should . . . view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Unsurprisingly, the Ninth Circuit has reiterated time and again that the reasonableness of deadly force is a fact-intensive question often unsuitable for determination on summary judgment. *See, e.g.*, *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) ("The reasonableness standard nearly always requires a jury to sift through disputed factual contentions, so summary judgment in an excessive-force case should be granted sparingly." (internal quotation marks and citation omitted). This too is such a case.

Defendants argue that the video clearly shows "Portillo's failure to comply with commands, his demeanor, and his possession of and move towards a lethal weapon." Dkt. 40 at 13. They maintain that "these undisputed facts are what led Dolan to reasonably believe that Portillo posed an immediate threat to both himself and the passengers." *Id.* Defendants contend that the video puts these facts beyond dispute, "virtually eliminat[ing] any material issues of fact." *Id.* at 2.

The Court disagrees. Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that Portillo was not moving to reach for his gun, but rather attempting to comply with Dolan's commands. Dkt. 32 at 22:00:30–36. The video footage clearly shows Portillo turning away from Dolan after Dolan yelled at him to put his hands on the ceiling "Right now!" *Id.* at 22:00:34–36. But what the video footage does not clearly show, despite Defendants' attempts to argue otherwise, is Portillo moving for the gun. *See id.*; Dkt. 40 at 9, 13 ("Dolan's decision to fire was based on Portillo's failure to comply with commands, his demeanor, and his possession of and move towards a lethal weapon."). There was no way for Portillo to comply with Dolan's command without moving his body in some way. A reasonable juror could disagree with Defendants' characterization of the video footage and find that Portillo was turning or moving to place both hands on the ceiling of the car. Based on the record

1   presented to the Court, there does not appear to be any clear evidence from the video of Portillo

2   reaching for his gun.

3          The Court must resolve this discrepancy in Plaintiff's favor in deciding this motion. *See*

4   *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (citations omitted) ("In cases where the best

5   (and usually only) witness who could offer direct testimony for the plaintiff about what happened

6   before a shooting has died, our precedent permits the decedent's version of events to be

7   constructed circumstantially from competent expert and physical evidence, as well as from

8   inconsistencies in the testimony of law enforcement."); *Calonge*, 104 F.4th at 44 (applying

9   evidentiary rules for deadly force cases and assuming that the victim of a fatal police shooting

10  did not "draw[] his gun or otherwise making a threatening gesture" where the officer who shot

11  him "observed [the victim's] elbow move away from his body" but other officers who "were also

12  watching [the victim] at the time . . . saw no such movement").

13         The Ninth Circuit's decision in *George v. Morris* is instructive. There, defendant police

14  officers responding to a domestic disturbance call shot and killed a sixty-four-year-old man

15  standing on his porch with a walker and a handgun pointed down towards the ground. *George*,

16  736 F.3d at 839.

17         In evaluating the reasonableness of the officers' conduct, the court emphasized the fact

18  that the victim, despite holding a gun and facing the officers, was not pointing it at them or

19  making other "furtive" or threatening movements. *See id.* at 838–39. And, as here, the officers in

20  that case had reason to believe the victim was armed going into the situation based on the 911

21  call they received. *Id.* at 831. The court distinguished the case from those finding constitutionally

22  valid uses of deadly force where "an individual points his gun *in the officers' direction*," or

23  where a victim "held a 'long gun' and *pointed it at*" officers. *See id.* at 838 (emphasis added)

24  (internal quotation marks omitted). The court concluded: "If the deputies indeed shot the sixty-

four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment." *Id.* at 839. A reasonable jury here could similarly decide that Portillo was shot without objective provocation, while the gun remained on his lap and he was attempting to comply with Dolan's commands.

Similarly, in *Cruz v. City of Anaheim*, 765 F.3d 1076, 1077–78 (9th Cir. 2014), officers confronted a suspected gang member during a traffic stop. The officers believed that the suspect was armed. *Id.* The district court denied qualified immunity. Affirming the district court's denial, the Ninth Circuit explained, "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Id.* at 1078. And "[g]iven Cruz's dangerous and erratic behavior up to that point . . . the police would doubtless be justified in responding to such a threatening gesture by opening fire." *Id.* But at the same time, the court held that "if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door." *Id.* at 1078–79. The Ninth Circuit has since explained that "*Cruz* establishes that officers may not fire at a suspect—even an armed suspect—absent some reason to believe that the suspect will soon access or use the weapon." *Peck v. Montoya*, 51 F.4th 877, 888 (9th Cir. 2022) (citing *Cruz*, 765 F.3d at 1078).

But, as the *Cruz* court explained, this is a question for the jury, not the Court:

> . . . [W]e need not worry about the intricacies of police procedure or nuanced questions of force proportionality. To decide this case a jury would have to answer just one simple question: Did the police see Cruz reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't.

> But for a judge ruling on the officers' motion for summary judgment, this translates to a different question: Could any reasonable jury find it more likely than not that Cruz didn't reach for his waistband?

*Cruz*, 765 F.3d at 1079. Though Dolan has testified that he believed Portillo was turning for the gun, the Court cannot draw inferences in his favor at summary judgment.

The disputed nature of Portillo's actions, and Dolan's responses, is further emphasized by the parties' dueling police practices experts. Plaintiff offers the testimony of police practices expert Russ Hicks. *See generally* Dkt. 41-20. Hicks opines that Dolan's communication was "emotionally driven"—exaggerated by fear when he saw the gun. Dkt. 41-20 at 52. From Hicks's experience, "Dolan's loss of composure resulted in a complete breakdown of communication which predictably escalated the situation unnecessarily." *Id.* Hicks also notes that Dolan failed to properly position himself and never attempted to deescalate the situation, disregarding training he had received. *Id.* at 50–52. And, per Hicks' "assessment of the . . . video . . . Portillo is not seen making any movements that could be construed as threatening." *Id.* at 55.

Conversely, Defendants' police practices expert, Chris Nielsen, opines that based on police training practices, Portillo's movements were threatening. He explains, "[a]s Mr. Portillo speaks, he nods his head in rhythm with his speech as if challenging Deputy Dolan." Dkt. 41-21 at 22. Nielsen also offers his opinion that de-escalation "is not appropriate where, as here, one party is non-compliant." *Id.* at 34. He concludes that, "Mr. Portillo was clearly capable of causing serious bodily harm or death by virtue of the two firearms he possessed – one of which was held on his lap. Further, a reasonable police officer under the same or substantially same circumstances would interpret Portillo's 'aggressive verbal communications,' noncompliance, and sudden movement toward the gun on his lap as 'hostile intent' and threatening." *Id.* at 38.[3]

---

[3] In a separate order, the Court has ruled on the limits of both experts' testimony. *See generally* Dkt. 64. While they may testify as to standards of police training and procedure, the experts may not opine on the ultimate "reasonableness" of Dolan's actions. *Id.* at 22, 23.

It is not for the Court to resolve these factual disputes. *See, e.g., Est. of Aguirre*, 29 F.4th at 628. Here, a reasonable jury could find that, though Portillo was armed, he did not make any furtive movements with the weapon, and Dolan shot Portillo while he was trying to comply with instructions. *See Banks v. Mortimer*, 620 F. Supp. 3d 902, 927 (N.D. Cal. 2022) ("a reasonable jury could doubt critical elements of" a defendant officer's testimony in part because "[t]he security camera footage [was] inconclusive" and the testimony of the officer who shot the victim was "inconsistent"). A jury may also reasonably conclude that Dolan's version of events is correct, and that he shot Portillo as he made a threatening movement to pick up the gun in his lap. *See* Dkt. 40 at 13. But the choice between these narratives requires weighing the evidence—scrutinizing the video, comparing it with the officer's and vehicle occupants' testimony and other physical evidence, and evaluating the various witnesses' credibility. These are factual determinations, tasks for the jury, not the Court.

**C.    Whether Portillo's Right to be Free from Excessive Force was Clearly Established**

Because there is a genuine issue of material fact as to whether Dolan violated Portillo's right to be free from excessive force, the qualified immunity inquiry focuses on whether the right at issue was clearly established. It is the plaintiff's burden to show that the right was clearly established. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (*Gordon II*). But while the plaintiff bears the burden of proving a right was "clearly established" at the time of the allegedly impermissible conduct, the Court should draw on its "full knowledge of relevant precedent rather than restricting [its] review to cases identified by the plaintiff." *Id.* (internal quotations omitted).

While courts accept the "general rule prohibiting excessive force," *Saucier v. Katz*, 533 U.S. 194, 207–08 (2001), the inquiry is case-specific, requiring the Court to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Id.* (citing *Wilson v. Layne*, 626 U.S. 603, 605 (1999)). The inquiry is also time-specific, requiring the Court to ask whether the right was clearly established when the incident occurred. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002).

The Court begins by looking to binding precedent. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). While courts do "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). Generally, the Court "must 'identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment.'" *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition," *Rivas-Villegas*, 595 U.S. at 5 (internal quotation marks omitted), but "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela*, 584 U.S. at 105 (quoting *White*, 580 U.S. at 79).

This prong of the analysis presents "purely a question of law for the court to decide." *Gordon*, 6 F.4th at 968 (citations omitted). In making its determination, as with the first prong, the Court resolves factual disputes in Plaintiff's favor and views the evidence in the light most favorable to Plaintiff. *See Mortimer*, 620 F. Supp. 3d at 929.

Plaintiff is correct that, viewing the evidence as the Court must in this posture, Portillo's right to be free from deadly force was clearly established when he was shot. Dkt. 54 at 18–19. First, prior to the events of this case, the law was clearly established that "law enforcement personnel 'may not kill suspects who do not pose an immediate threat to their safety' even if the suspects are armed." *Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1013 (W.D. Wash. 2020)

(quoting *Van Bui v. City & Cnty. of San Francisco*, 699 Fed. App'x 614, 616 (9th Cir. 2017)); *see also Harris v. Roderick*, 126 F.3d 1189, 1203–04 (9th Cir. 1997).

In her brief, Plaintiff points to *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011). Dkt. 54 at 18. In *Glenn*, a teenager was shot and killed in the driveway of his home by police officers. 673 F.3d at 866. The officers had responded to an emergency call made by his mother who was "distraught" that her son was threatening to kill himself with a pocketknife. *Id.* The district court granted summary judgment, finding no constitutional violation, and the Ninth Circuit reversed. *Id.* The Ninth Circuit noted, "we are aware of no published cases holding it reasonable to use a significant amount of force to try to stop someone from attempting suicide. Indeed, it would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself." *Id.* at 872. The Court thus concluded that the officers' actions were not objectively reasonable. *Id.*

The facts of *Glenn* are different from those in the present case. But *Glenn* nevertheless stands for an important proposition: the possession of a deadly weapon is not alone sufficient to make a use of force reasonable. *Id.* at 872–73. Rather, the Ninth Circuit has always "engaged in a context-specific analysis rather than resting [the court's] holding on the single fact that the suspect was armed." *Id.* at 873 (citing cases).

Dolan "is not entitled to qualified immunity simply because there [is] no case on all fours prohibiting [this] particular manifestation of unconstitutional conduct." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 974–75 (9th Cir. 2005) (cleaned up). "There need not be prior authority dealing with this precise factual situation in order to deny [defendant] qualified immunity for his actions." *Id.* at 975 (first citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); and then citing *Sorrels*, 290 F.3d at 970). "Rather, the state of the law at the time . . . must have provided" Dolan "with 'fair warning' that his conduct was unconstitutional." *Id.* (quoting

*Hope*, 536 U.S. at 741). At the time Dolan shot Portillo, it was clearly established that an individual's possession of a weapon alone is insufficient to justify deadly force. *Glenn*, 673 F.3d at 872–73. This is something Dolan knew or should have known at the time of the incident. *See, e.g.*, *Harlow*, 457 U.S. at 815 ("[W]e have held that qualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff][.]" (cleaned up).

More importantly, Ninth Circuit precedent since *Glenn* make clear that Portillo's rights were clearly established, in factual circumstances more analogous to this case. Here, *Cruz* is again instructive. In *Cruz*, a confidential informant told Anaheim police that Cruz was a gang member who carried a gun, often stored in the waistband of his jeans. 765 F.3d at 1077–78. Several officers were sent to Cruz's location. *Id.* at 1078. The officers observed that Cruz's vehicle had a broken taillight, so they executed a traffic stop. *Id.* Cruz attempted to escape, backing his vehicle into one of the patrol cars in the process. *Id.* Cruz eventually stopped, and the officers got out of their vehicles with weapons drawn. *Id.* Cruz opened his door, and the police demanded he lay flat on the ground. *Id.* According to several of the officers, he ignored their directives and instead reached for the waistband of his pants. *Id.* Fearing that he was reaching for a gun, the officers opened fire. *Id.*

Given the facts, the district court granted summary judgment, but the Ninth Circuit overturned the decision on review. *Id.* at 1081. The Ninth Circuit explained that it would be reasonable for the officers to shoot Cruz if he was reaching for a gun. *Id.* at 1079. But, conversely, it would be unreasonable for them to shoot him after he was complying. *Id.* at 1078–79. "At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified." *Id.* at 1079 (citing *Garner*, 471 U.S. at 9–12).

The Ninth Circuit has regularly followed *Cruz*. In *Estate of Elkins v. Pelayo*, the Ninth Circuit again held summary judgment inappropriate where it was unclear if a suspect was reaching for a gun in his waistband and an officer, perceiving the movement as a threat, shot and killed the suspect. 737 F. App'x 830, 831–32 (9th Cir. 2018) ("Because we conclude that a reasonable jury could find it more likely than not that Elkins was *not* reaching for his waistband just before he was shot, we reverse and remand.") And in *Daily v. City of Phoenix*, the Court similarly refused to grant summary judgment where it was unclear if an individual was threatening police with a weapon. 765 F. App'x 325, 326 (9th Cir. 2019), as amended on denial of reh'g and reh'g en banc (May 21, 2019). Referencing *Cruz*, the Ninth Circuit held that "because there is a genuine factual dispute about whether Pithan picked up a stick, the district court erred in granting summary judgment on Plaintiffs' Fourth Amendment excessive force claim." *Id.*; *see also Longoria v. Pinal Cnty.*, 873 F.3d 699, 706–07 (9th Cir. 2017) (similar); *Warden v. Cowan*, No. 20-17405, 2022 WL 999940, at *3 (9th Cir. Apr. 4, 2022) ("It is clearly established that firing on someone who makes no 'furtive movement, harrowing gesture, or serious verbal threat' is unreasonable, even where the suspect is still armed with a deadly weapon. Because the facts surrounding Warden's alleged 'furtive movement' and whether it objectively posed an immediate threat to a reasonable officer under the circumstances are in dispute, we cannot conclude on the present record that Officers Cowan and Weaver are entitled to qualified immunity as a matter of law.") (cleaned up).

Defendants cite several cases to argue that the law is not clearly established. Dkt. 40 at 17–19. But if anything, many of these cases point to the contrary. For example, Defendants cite *Estate of Lopez v. Gelhaus* for the proposition that "[t]he case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." Dkt. 40 at 17 (citing *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998

(9th Cir. 2017)). But in *Estate of Lopez*, the Ninth Circuit held that the law was clearly established that use of deadly force under the circumstances was unreasonable, and the defendant officer was not entitled to qualified immunity. *Id.* at 1021. There, the suspect appeared to be carrying an AK-47, but the officers had not received any reports of the suspect's using of the weapon or expressing an intention to use it, nor had the suspect threatened the officer. *Id.* at 1004. And the suspect was not warned that deadly force would be deployed, even though the officers had the opportunity to do so. *Id.* at 1019. The only similarity appears to be that the officer in *Estate of Lopez* discovered the suspect while on "routine patrol," just as Dolan did here. *Id.*; *see also* Dkt. 41-1 at 9. But the Ninth Circuit uses that factor to caution against finding that the officer's actions were reasonable. Rather, because the officer was not responding to "a potential crime that might have caused him to be concerned for his safety" there was less reason to use deadly force. *Estate of Lopez*, 871 F.3d at 1019.

Defendants also point to *George v. Morris*, discussed above. Dkt. 40 at 17. As explained in Section IV.B., the court in *George* distinguished the case from those finding constitutionally valid uses of deadly force where "an individual points his gun *in the officers' direction*," or where a victim "held a 'long gun' and *pointed it at*" officers. *George*, 736 F.3d at 838 (emphasis added) (internal quotation marks omitted). The case does, as Defendants point out, provide that officers need not "delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* But the case more appropriately stands for the proposition that deadly force should not be used simply because an individual is armed. If anything, the case clearly establishes that Portillo had a right to be free of excessive force, despite his possession of a firearm. And, as discussed further below, the case holds that a jury should determine if Portillo's movement did create an immediate threat.

Defendants go on to cite various district court cases, none of which are controlling and all of which are materially different. Dkt. 40 at 17–19. For example, in *Estate of Paul Rea v. County of Los Angeles*, the decedent had already engaged in a physical altercation with the officer, in which the officer felt a gun, and the decedent then reached for the area of his waistband where the officer had felt the gun. No. CV 20-1691-JFW(AFMX), 2021 WL 9699494, at *10 (C.D. California October 7, 2021) ("Saavedra was confronted with a rapidly unfolding situation that included an armed suspect who had punched Saavedra with such force that it caused his knees to buckle, his neck to crack, and his vision to blur. . . . As a result, at the time Saavedra was required to make a split second decision to fire his weapon, Rea had just violently assaulted Saavedra, was in possession of a gun, and Saavedra reasonably believed that Rea was reaching for and would use that gun to kill Saavedra."). Here, Portillo, though possibly argumentative, had given the officer no other reason to think that he was a threat.

Similarly, in *Yoakum v. Crook County*, the decedent had made threats that increased the officer's estimation of the present threat. No. 2:23-CV-00001-HL, 2024 WL 2749525, at *6–8 (D. Or. Apr. 24, 2024), report and recommendation adopted as modified, No. 2:23-CV-00001-HL, 2024 WL 2747499 (D. Or. May 28, 2024). There, the decedent had placed a 911 call, claiming "[y]ou need to come pick me up before I flip out and hurt somebody." *Id.* at *1. The dispatcher confirmed that the decedent had a felony warrant and was on probation for assault. *Id.* at *2. When an officer found the decedent, the situation escalated quickly, and the decedent advanced toward the officer, refusing to comply with an order to stay on the ground and keep his hands in view. *Id.* at *3–4.

From these and other cases, the Defendants conclude that the "[t]he law is clearly established that an officer is entitled to qualified immunity even if he uses deadly force where a suspect does not actually have a weapon when the circumstances would lead the officer to

conclude a suspect is reaching for one." Dkt. 40 at 19. The Court disagrees. Rather, the Court finds that the law is clearly established that an individual has a right to be free from excessive force, even when in possession of a firearm, so long as they are not a threat to others. *See, e.g.*, *Cruz*, 765 F.3d at 1077–79; *George*, 736 F.3d at 839; *Glenn*, 673 F.3d at 873–78. As laid out above, whether Portillo was in fact a threat to Dolan is a question of fact to be determined by the jury. *See, e.g.*, *George*, 736 F.3d at 837–39 (explaining that genuine issues of material fact as to whether decedent, who was holding a handgun, posed an immediate threat to the safety of deputies precluded summary judgment, on qualified immunity grounds, on plaintiff's excessive force claim); *see Briscoe*, 483 F.Supp.3d at 103–14 ("Whether [decedent] . . . attempted to gain access to it cannot be determined as a matter of law. . . . To be clear, the Court is not concluding that [officers] are not entitled to qualified immunity; the Court is merely ruling that factual questions preclude a grant of summary judgment on the subject and the issue of whether [officers] should be insulated from personal liability must await trial.").

The Court decides prong two in favor of Portillo. Having decided that both prongs favor Plaintiff, the Court declines to grant summary judgment to Defendant Dolan on the Fourth Amendment claim. That said, because the Court's decision for both prongs of the analysis is based on disputed facts, Defendants may still raise their qualified immunity defense at trial. *See Selto v. Clark Cnty.*, No. 22-CV-5384, 2023 WL 6311284, at *7 (W.D. Wash. Sept. 28, 2023), aff'd sub nom. *Selto v. Cnty. of Clark*, No. 23-2531, 2024 WL 3423717 (9th Cir. July 16, 2024).

**D.    Liability of Defendants Pierce County and Sheriff Troyer**

*1.*    Monell *Liability*

Section 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Yet *Monell* also "held that municipalities are

'persons' subject to damages liability under section 1983 where 'action pursuant to official municipal policy of some nature causes a constitutional tort.'" *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting *Monell*, 436 U.S. at 691). "[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694); *see Mohamed Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 885 (9th Cir. 2022) ("Under *Monell*, plaintiffs suing a municipal entity for damages under 42 U.S.C. § 1983 'must show that their injury was caused by a municipal policy or custom.'" (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 30–31 (2010)). This includes "both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted) (after proving circumstances showing ratification, "a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation").

Plaintiff brings a *Monell* claim against Pierce County under one of the three recognized theories of *Monell* liability: ratification. *See Gillette*, 979 F.2d at 1346–47. Under this theory, "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "[A] single incident causally related to the constitutional deprivation may be sufficient for liability to attach" for a ratification claim. *Trevino*, 99 F.3d at 918 n.2 (citations omitted). But "[r]atification requires, 'among other things, knowledge of the alleged constitutional violation.'" *Mohamed Sabra*, 44 F.4th at 885 (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)). "The mere fact that an officer was not reprimanded or provided with additional training cannot support a theory of ratification." *German v. Roberts*, No. C15-

5237 BHS-DWC, 2017 WL 6547472, at *2 (W.D. Wash. Dec. 22, 2017) (first citing *Morales v. Fry*, C12-2235-JCC, 2014 WL 1230344, at *14 (W.D. Wash. Mar. 25, 2014); then citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir. 2010)).

As its evidence supporting this theory, Plaintiff argues that "[m]unicipal liability can attach where a police department reviews and deems an unconstitutional act was in compliance with policy." Dkt. 54 at 13. Plaintiff points out that "Pierce County and Sheriff Troyer . . . ratified and approved Defendant Dolan's unconstitutional conduct as compliant with Pierce County policy for the use of deadly force." *Id.* at 14. Plaintiff explains that, after the shooting, "the incident was reviewed by the Pierce County Board of Professional Standards. . . . [the Board] found . . . that the Defendant Deputy was in compliance with Pierce County policies regarding the use of deadly force." *Id.* at 14.

But this evidence does not show that these approvals caused the constitutional violations at issue. *See Harris*, 489 U.S. at 389; *Gravelet-Blondin*, 728 F.3d at 1096; *Mohamed Sabra*, 44 F.4th at 885. Consistent with the causation requirement, the Ninth Circuit has treated a failure to show that policymakers knew of the alleged constitutional violations "*before* the alleged constitutional violations ceased" as sufficient reason to grant summary judgment on a ratification claim. *See Christie*, 176 F.3d at 1239 (emphasis added); *see also Mueller v. Cruz*, No. SA CV 13-01274-CJC, 2015 WL 9455565, at *3 (C.D. Cal. Dec. 23, 2015) ("Here, Mueller has not alleged that any policymaker acted or was aware of a policy or culture of acceptance of illegal force such as that allegedly used by Cruz . . . 'before the alleged constitutional violations ceased.' . . . Rather, Rackauckas and Hutchens exonerated Deputy Cruz *after* the alleged use of excessive force." (emphasis added) (quoting *Christie*, 176 F.3d at 1239)).

The Ninth Circuit has recognized that a plaintiff "cannot, of course, argue that the municipality's later action (or inaction) caused the earlier" use of force in the absence of "any

pre-existing policy." *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), overruled on other grounds by, 543 U.S. 194 (2004). Such analysis may be appropriate where the Court finds that "acceptance of an obviously flawed investigation constituted evidence of a *pattern and practice* of condoning police abuse." *Cole v. Doe I thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005) (emphasis added).

But that is not the case here. Thus, "[a]lthough some municipal pronouncements ratifying a subordinate's action could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*, here there are no facts in the record that suggest that the [] failure" to denounce Dolan's actions "rises to the level of such a ratification." *Haugen*, 339 F.3d at 875. Without any evidence (or explanation) of causation, Plaintiff has not shown a genuine dispute of material fact on their *Monell* claim.

### 2.    *Supervisory Liability – Defendant Sheriff Troyer*

Plaintiff also appears to bring a supervisory liability claim against Defendant Troyer. Dkt. 1 at 7 ("The proper monitoring and supervision of the Pierce County Sheriff's Deputies would have either rectified and modified Deputy Dolan's conduct."). "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others." *Larez*, 946 F.2d at 646 (cleaned up). As explained in *Larez*:

> A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury. Yet, this does not prevent a supervisor from being held liable in his individual capacity. Like the officers, Gates's individual liability hinges upon his participation in the deprivation of constitutional rights. But unlike the officers' involvement, which ordinarily is direct and personal, his participation may involve the setting in motion of acts which cause others to inflict constitutional injury.

*Id.* at 645. (citing *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) (cleaned up); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if [he] participated in or directed the violations, or knew of the violations and failed to act to prevent them.").

Plaintiff argues that "[a] jury could conclude that because of the Defendant Deputy's inadequate training and the laissez faire policies that existed within the Pierce County Sheriff's Office," Dolan was poorly trained and supervised. Dkt. 54 at 16. And Plaintiff maintains, "[t]hese are all policies and practices which are the direct responsibility of Sheriff Ed Troyer." *Id.* at 15.

Yet "neither the Supreme Court nor our circuit has established that an official's post-incident ratification of or acquiescence to a claimed constitutional violation is alone sufficient for individual liability under § 1983." *Hunt v. Davis*, 749 F. App'x 522, 525–26 (9th Cir. 2018). Plaintiffs do not point to any evidence that Sheriff Troyer set in motion a series of acts that led to Dolan's conduct or that he was aware of similar ongoing constitutional violations that he failed to act to prevent before Portillo's shooting. *See id.* at 525 (citations omitted) ("[A]llegations of knowledge of ongoing wrongdoing and a subsequent failure to intervene are required."); *cf. Starr*, 652 F.3d at 1216 (plaintiff plausibly alleged supervisory liability based on failure to address ongoing constitutional violations when the defendant "took no action to stop his

subordinates' repeated violations of prisoners' constitutional rights despite being repeatedly confronted with those violations").

Summary judgment is granted as to Plaintiff's supervisory liability claims against Defendant Sheriff Troyer and her *Monell* claims against Defendants Troyer and Pierce County.

**E.    Plaintiff has abandoned her state law claims.**

Defendants move for summary judgment on Plaintiff's negligence claim on the grounds that 1) Defendants are entitled to state-law qualified immunity and 2) that Plaintiff cannot meet her burden to overcome summary judgment. Dkt. 40 at 24. Plaintiff's opposition briefing fails to respond to Defendants' arguments. *See generally* Dkt. 54. Defendants argue in reply that, because Plaintiff does not oppose dismissal, the Court "should take Plaintiff['s] failure to address Defendants' arguments as a concession that Plaintiff['s] claims lack merit." Dkt. 57 at 11.

Defendants are correct. When a party fails to respond to an argument made to dismiss a claim, the argument is waived. *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n. 7 (9th Cir. 2016) ("But the plaintiffs did not raise that argument to the district court in their motion for summary judgment or opposition to the defendants' motion for summary judgment, so the argument was waived."); *Samica Enterprises LLC v. Mail Boxes Etc., Inc.*, 460 F. App'x 664, 666 (9th Cir. 2011) ("Arguments not raised in opposition to summary judgment or in the opening brief before this court are waived."); *Reliance Ins. Co. v. Doctors Co.*, 299 F. Supp. 2d 1131, 1154 (D. Haw. 2003) ("Failure to raise issues in opposition to summary judgment functions as a waiver" of the argument); *Matter of Disability Rts. Idaho Request for Ada Cnty. Coroner Recs. Relating to the Death of D.T.*, 168 F. Supp. 3d 1282, 1288 n. 5 (D. Idaho 2016) ("Ada County failed to respond to this argument in its response to DRI's Motion for Summary Judgment. The Court accordingly finds the issue waived and dismisses Ada County from this action.").

In failing to respond to Defendants' request to dismiss this claim, Plaintiff has waived the issue. Thus, Plaintiff's state law claims are dismissed.

Defendants have also argued that Plaintiff may not bring her state law claims as an individual, rather than as the representative of Portillo's estate. Dkt. 40 at 31–33. Because Plaintiff has abandoned her state law claims, the issue is now moot. Plaintiff may proceed as a representative of the estate for the Fourth Amendment claims. *See* RCW 4.20.046.

## V.    CONCLUSION

For the reasons explained above, the Court ORDERS as follows:

- Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Fourth Amendment claim against Defendant Dolan.

- Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's *Monell* and supervisory liability claims and her state law negligence claims against Defendants Troyer and Pierce County. These claims are DISMISSED with prejudice.

- Defendants Troyer and Pierce County are DISMISSED from this case with prejudice.

Dated this 27th day of January, 2025.

Tiffany M. Cartwright
United States District Judge